UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY WASHINGTON,

                              Plaintiff,                    **MEMORANDUM OPINION**
                                                           **& ORDER**
                -against-
                                                           09 Civ. 9199 (PGG)
TAMMI CHABOTY,
PAUL GONYEA, and
KEITH GRANGER,

                              Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

> This is a Section 1983 action brought by pro se plantiff Anthony Washington against defendant officers of Woodbourne Correctional Facility ("Woodbourne") who were involved in the decision to discipline him for communicating messages of a personal nature to a corrections officer. Washington alleges that Defendants' actions violated his right to due process, constituted retaliation against him for the exercise of his First Amendment rights to free speech and free exercise of his religion, and violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000 et seq..

> Defendants have moved to dismiss, arguing that Washington has failed to set forth a due process or other constitutional violation, or a statutory claim, and that, in any event, they are entitled to qualified immunity. For the reasons set forth below, Defendants' motion to dismiss will be GRANTED.

## BACKGROUND

The disciplinary charges against Washington stem from an incident that took place on the evening of August 6, 2006, while Washington was working as a clerk in the Muslim chaplain's office located in the "F-Wing" at Woodbourne.  (Cmplt. ¶ 1)  Defendant Corrections Officer Tammi Chaboty was on duty in the F-Wing.  (Cmplt. ¶ 2)  Washington had a good relationship with Chaboty and occasionally discussed his Muslim beliefs with her.  (Cmplt. ¶ 3-4; Ex. C 19-21)[1]

At about 9:00 p.m., Washington called Chaboty into the chaplain's office and asked if he could give her a present.  (Cmplt. ¶ 7)  Washington then gave Chaboty a copy of the Quran and two sheets of notes that "informed [her] about the Holy Quran and the methodology

---

[1]  In determining the sufficiency of a complaint, this Court may consider "the factual allegations in [the] . . . complaint, . . . documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc. , 987 F.2d 142, 150 (2d Cir. 1993)); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (documents that are "integral" to the complaint may be considered on motion to dismiss); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (court may consider documents plaintiff relied on in framing the complaint).

  Here, this Court will consider the following documents because they are incorporated by reference or relied upon in the Complaint:  (1) the two sheets of notes Washington inserted in the Quran that he gave to Chaboty; (2) the August 7, 2006 misbehavior report prepared by Chaboty; (3) the transcript of Washington's August 11-21, 2006 disciplinary hearing; (4) the August 21, 2006 Superintendent Hearing Disposition Form; (5) the October 11, 2006 Review of the Superintendent Hearing Disposition Form; and (6) the Appellate Division decision concerning Washington's Article 78 challenge to the determination finding him guilty of violating a prison disciplinary rule (Washington v. Selsky, 48 A.D.3d 864 (3d Dept. 2008)).

  While the Second Circuit has cautioned that "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint," Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004), here Washington alleges that Defendant Paul Gonyea, Woodbourne's Deputy Superintendent, denied him due process by "mentioning evidence not found in the record in his statement of evidence relied upon."  (Cmplt. ¶ 71)  Accordingly, the hearing transcript, which embodies the record, is "integral" to the Complaint.

followed in understanding its verses."  (Cmplt. ¶ 10)  Washington later left the chaplain's office and returned to his cell for the night.  (Cmplt. ¶ 11)

The following morning, Sergeant Keith Granger, Chaboty's supervisor, told Washington that he would be placed in the Special Housing Unit ("SHU") as a result of the Quran incident.  (Cmplt. ¶ 13-14)  According to the Complaint, Defendant Granger informed Washington that he intended to prepare a misbehavior report concerning the incident and that "Chaboty had a life of her own and she did not need [Washington] telling her how to live it." (Cmplt. ¶ 18, 20)

That same day, Chaboty prepared an Inmate Misbehavior Report in which she recounted the evening's events.  (Harben Decl., Ex. B)  Although her account of the incident is similar to Washington's, Chaboty's report states that Washington approached her twice, first to indicate that he wanted to speak with her and then to make clear that he was inviting her to speak with him in the chaplain's office.  (Id.)  Chaboty's report emphasizes that "there were no other inmates or staff in the immediate area" when Washington approached her, and she accuses him of violating prison rules concerning "soliciting," "stalking," and "communicating messages of a personal nature to an employee."  (Id.) [2]

Between August 11 and August 21, 2006, Defendant Gonyea, Woodbourne's deputy superintendent, conducted a hearing to determine whether Washington was guilty of these rule infractions.  At the hearing, Chaboty recounted the events of August 6, adding that Washington was wearing "an eerie type of smile" when he summoned her to give her the Quran,

---

[2]  "Communicating Messages of a Personal Nature to an Employee" is a form of "harassment" under Prison Rule 107.11.  Under this rule, harassment "includes but is not limited to using insolent, abusive or obscene language or gestures or writing or otherwise communicating messages of a personal [nature] to an employee or any other person."  (Harben Decl., Ex. C at 42)

and that she found his expression "very unnerving."  (Harben Decl., Ex. C, at 28)  Chaboty
described the incident as "nothing like I've ever experienced either working as an officer or a
civilian in this department."  (Id. at 29)  Deputy Superintendent Gonyea reviewed the notes
Washington had inserted into the Quran, however, and found that they contained "nothing of a
personal nature" and merely addressed " interpretation of the [Quran]."  (Id. at 35)  Chaboty also
confirmed that in the past Washington had "always addressed [her] in a professional, respectful
manner," and that she and Washington had "briefly" conversed about religion before the Quran
incident.  (Id. at 19)

   During the hearing, Gonyea noted that "misbehavior report[s] should be written as
soon as practical" after alleged misbehavior (id. at 45), and that Chaboty had not prepared her
report until the day after the incident.  (Harben Decl., Ex. B)  Chaboty explained her delay by
stating that she knew that "something was not correct" about the incident, but that she wanted to
seek "[Granger's] opinion or advice" before writing a misbehavior report.  (Id. at 23)

   At the conclusion of the hearing, Deputy Superintendent Gonyea found
Washington not guilty of the stalking and soliciting charges, but found him guilty of violating
"Rule 107.11, harassment verbal by gesture, also . . . comments of [a] personal nature to
employees":

> I found your conduct in this incident was harassing [in] that you asked to speak to
> the officer but you did not go to her desk.  You called her and gestured for her to
> go into the office you were at.  No one else was in the area at that time.  You
> presented to the officer that you had a present for her.  That was a message of a
> personal nature.

(Id. at 50-51)

   Gonyea summarized the evidence on which he based his findings as follows:

> The evidence I relied upon is the following:  the written report of Officer Chaboty
> and her verbal testimony that you asked to talk to her, that you remained in the

4

> Muslim office and . . . nodded for her to go into the office. . . . Officer Chaboty
> testifies she felt intimidated and uncomfortable with you trying to get her to go
> into the office to speak to you, and you stating that you had a present for her.

(Id.)

Washington alleges that Gonyea "stopped the recording [at the conclusion of the hearing] and told [Washington that] he only found [Washington] guilty . . . in order to separate him from staff and transfer him."  (Cmplt. ¶ 38)

After the hearing, Gonyea completed a Superintendent Hearing Disposition Form, in which he reiterated the basis for his findings and sentenced Washington to 65 days in the SHU and loss of privileges, including access to religious services, packages from home, and phone and commissary privileges.  (Harben Decl., Ex. F)  Washington's Complaint alleges that he was "forced to be in an unfurnished cell for at least 23 hours a day," that he was "given smaller rations of mess hall food and denied group meals," and that he was "limited to three (3) five-minute showers a week, and escorted everywhere (even to showers and recreation) shackled." (Cmplt. ¶ 42)  Washington alleges that "[t]hese punitive conditions do not exist in the general population," and that he found the "the conditions in Woodbourne's S.H.U. . . . extremely harsh."  (Cmplt. ¶ 42-43)  Washington appealed his conviction to the State Department of Correctional Services, but the conviction was affirmed by summary order on October 11, 2006. (Cmplt. ¶ 42)

According to the Complaint, Washington was transferred six times while serving his SHU sentence.  He experienced "filthy" cell conditions and was not permitted to atttend Ramadan religious services.  (Cmplt. ¶ 47-49)

In October 2006, Washington was assigned to Franklin Correctional Facility, where he alleges he was "denied a job working in the facility's library due to advers[e] reports in his prison file relating to the Woodbourne incident."  (Cmplt. ¶ 56)  Washington was also denied

parole in May 2007, and he claims that the parole panel "considered the . . . disposition by

Gonyea of August 21, 2006, in making its determination."  (Cmplt. ¶ 61)   After another transfer

in July 2007 to Southport Correctional Facility, Washington alleges that he was "denied a job

working as a clerk for the Muslim chaplain . . . due to adverse reports relating to the

Woodbourne incident that were placed in his prison files."  (Cmplt. ¶ 63)

        In January 2007, Washington brought an Article 78 proceeding challenging the

determination finding him guilty of harassment.  The Third Department concluded that the

harassment determination was not supported by substantial evidence:

> Upon reviewing this record, we do not find that substantial evidence supports the
> determination at issue.  The female officer admitted that she had had
> conversations with petitioner in the past concerning religion, and petitioner
> testified that, based upon their conversations, he decided to give her the book as a
> gift.  Although the officer testified that petitioner exhibited an "eerie" smile which
> she found "very unnerving," she did not indicate that he engaged in any
> inappropriate or disrespectful behavior and she confirmed that he had always
> addressed her professionally in the past.  Petitioner's conduct appears to have
> been a continuation of a cordial relationship between the officer and the
> petitioner.
>
> Under these circumstances, we cannot conclude that it rose to the level of
> harassment as contemplated by 7 NYCRR 270.2(b)(8)(ii).  Accordingly, the
> determination must be annulled.

Washington v. Selsky, 48 A.D.3d 864, 865 (3d Dept. 2008) (citations omitted).  The court

directed the Commissioner of Correctional Services to "expunge all references to this matter

from petitioner's institutional record."  Id.

        In this action, Washington alleges that

> Defendant Gonyea violated plaintiff's rights to freedom of religious exercise,
> freedom of speech, and due process of law by punishing him with a false
> misbehavior report, failing to provide a fair and impartial hearing, finding him
> guilty of false charges without evidence, mentioning evidence not found in the
> record in his statement of evidence relied upon ("Chaboty testified she felt
> intimidated"), punishing him with 65 days S.H.U., and transferring [him] to
> another facility in retaliation for plaintiff giving Chaboty a religious book and a

> two-page communication.  Defendant Granger violated plaintiff's rights to
> freedom of religious exercise and freedom of speech by writing [a] false
> misbehavior report and memorandum against plaintiff in retaliation for plaintiff
> giving Chaboty a religious book and two-page religious communication.
> Defendant Chaboty violated plaintiff's rights to freedom of religious exercise and
> free speech by writing a false misbehavior report against him in retaliation for
> giving her a religious book and a two-page communication.

(Cmplt. ¶ 71-73)

## DISCUSSION

## I.    LEGAL STANDARD

"To survive a motion to dismiss," a claim "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.

Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  In making this determination, a court must be

mindful of two corollary rules.  "First, the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions."  Id.  In other words,

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).  "Second, only a complaint

that states a plausible claim for relief survives a motion to dismiss."  Id. at 1950 (citing

Twombly, 550 U.S. at 556).  In addition, "[a] complaint which consists of conclusory allegations

unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."  DeJesus v.

Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996) (citation omitted).  The Supreme Court has

stated that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense."  Id. (citation omitted).

Because Washington is proceeding pro se, this Court is required to read his complaint liberally, see Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)) ("A document filed pro se is to be 'liberally construed.'"). Accordingly, this Court will construe the plaintiff's complaint "'to raise the strongest arguments that [it] suggest[s].'" Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (quoting Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001)).

## II.   PLAINTIFF'S DUE PROCESS CLAIM

### A.   Atypical and Significant Hardship

The Complaint alleges that Defendant Gonyea violated Plaintiff's right to due process "by punishing him with a false misbehavior report, failing to provide a fair and impartial hearing, finding him guilty of false charges without evidence, [and] mentioning evidence not found in the record in his statement of evidence relied upon ('Chaboty testified she felt intimidated')." [3]  (Cmplt. ¶ 71)

The Fourteenth Amendment to the Constitution provides that "no State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The "threshold question . . . in all cases where an individual claims his due process rights have been violated, is whether the alleged deprivation is substantial enough to invoke the protections of the Due Process Clause." McCann v. Coughlin, 698 F.2d 112, 120 (2d Cir. 1983). In order to meet this threshold, "[a] liberty interest must . . . be such that its deprivation would subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents

---

[3]  Although Defendants argue that "'[a] prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest,'" (Def. Br. at 4 (quoting Freeman v. Rideout, 808 F.2d 949, 951, (2d Cir. 1986), cert. denied, 485 U.S. 982 (1988)), that is not the issue in this case.  The Complaint makes clear that Washington is challenging not merely the accusations in the Misbehavior Report, but his 65-day confinement in the SHU as well.  For this reason, this Court's due process analysis focuses on the SHU sentence and not the Misbehavior Report.

of prison life.'"  Welch v. Bartlett, 196 F.3d 389, 392 (2d Cir. 1999) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).

In determining whether SHU confinement imposes an "atypical and significant hardship," the court must consider how it compares "to the hardships endured by prisoners in general population."  Welch, 196 F.3d at 393.  This requires the court to make a "'fact-intensive inquiry,' examining 'the actual circumstances of SHU confinement.'"  Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (quoting Sims v. Artuz, 230 F.3d 14, 23 (2d Cir. 2000) (internal citation omitted)).  "In the absence of a detailed factual record, [the Second Circuit has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short – less than the 30 days that the Sandin plaintiff spent in SHU – and there was no indication that the plaintiff endured unusual SHU conditions."  Palmer, 364 F.3d at 65-66.

Here, the Complaint alleges that Washington was confined in the SHU for 65 days, that he was locked in his cell for 23 hours a day, denied rehabilitative and reentry programs, given smaller rations of food than general population prisoners, prevented from attending religious services, limited to three showers per week, escorted everywhere in shackles, and denied phone, package and commissary privileges.  The Complaint also alleges that "[t]hese punitive conditions do not exist in the general population," and that Washington's SHU sentence has prevented him from obtaining several desirable prison jobs.  (Cmplt. ¶ 42, 56, 63)

The Court finds that Washington has pled "sufficient factual matter" to demonstrate that he experienced an "atypical and significant hardship."  See Iqbal, 129 S. Ct. at 1949.  Accordingly, the Court will assume for purposes of this motion that Washington had a

protected liberty interest in not being confined to the SHU, and that he was thus entitled to the protections of the Due Process Clause during his August 2006 disciplinary proceeding.[4]

### B.   **Adequacy of the Decision-making Process**

Although the Complaint adequately pleads a deprivation of liberty sufficient to invoke the protections of the Due Process Clause, even when those protections are applicable, an inmate facing disciplinary measures is not entitled to "'the full panoply of rights' due to a defendant in a criminal prosecution." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (quoting Wolff v. McDonnell, 418 U.S. 539, 556 (1974)). Instead, the inmate is only entitled to "those minimum procedures appropriate under the circumstances . . . to insure that the state-created right is not arbitrarily abrogated." Wolff, 418 U.S. at 557. These procedures include 24-hour written notice of the charges; a written statement by the factfinder as to the reasons for the disposition and the evidence relied upon; and the right to call witnesses and present documentary evidence when doing so will not interfere with "institutional safety or correctional goals." Id. at 563-67. Washington does not dispute that these procedures were followed, but alleges that he was found guilty on the basis of insufficient evidence.

The Supreme Court has held that when an inmate challenges the outcome of a disciplinary proceeding on sufficiency grounds, a reviewing court should uphold the outcome so long as "the findings of the prison disciplinary board are supported by some evidence in the

---

[4] Washington also alleges that he had a protected liberty interest in not being transferred within the prison system. (Cmplt. ¶ 71) However, "'an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State,'" Lewis v. Rawson, 564 F.3d 569, 578 (2d Cir. 2009) (quoting Olim v. Wakinekona, 461 U.S. 238, 245 (2002)), and therefore "due process rights [do] not attach when inmates [are] transferred from a lower-security prison to a higher-security one within the same state prison system." Huang v. Johnson, 251 F.3d 65, 72 (2d Cir. 2001) (citing Meachum v. Fano, 427 U.S. 215 (1976)). Thus, assuming Washington's account of Gonyea's post-hearing comments is accurate (as this Court must for purposes of this motion), these allegations are insufficient to state a due process claim, because transfer between prisons does not constitute an "atypical and significant hardship" under the Due Process Clause.

record." Superintendent v. Hill, 472 U.S. 445, 454 (1985) (upholding revocation of good time

credits against due process challenge where disciplinary board's finding was supported by "some

evidence"). "This standard is met if 'there was some evidence from which the conclusion of the

administrative tribunal could be deduced . . . .,'" and does not require the reviewing court to

engage in "'examination of the entire record, independent assessment of the credibility of

witnesses, or weighing of the evidence.'" Id. at 455 (quoting Vajtauer v. Commissioner of

Immigration, 273 U.S. 103, 106 (1927)). "Instead, the relevant question is whether there is any

evidence in the record that could support the conclusion reached by the disciplinary board." [5]

Hill, 472 U.S. at 455-56.

Although the Hill standard is intended to be deferential, so as to avoid

"threatening institutional interests or imposing undue administrative burdens," see id. at 455, the

Second Circuit "has not construed the phrase 'any evidence' literally." Luna v. Pico, 356 F.3d

481, 488 (2d Cir. 2004) (quoting Hill, 472 U.S. at 455). Rather, in practice, it has required that

the evidence relied on to impose a disciplinary sanction have some measure of reliability. See

Gaston v. Coughlin, 249 F.3d 156, 163 (2d Cir. 2001) ("'some evidence' standard may be met

even where the only evidence was supplied by a confidential informant, 'as long as there has

been some examination of indicia relevant to [the informant's] credibility'") (quoting

Giakoumelos v. Coughlin, 88 F.3d 56, 61 (2d Cir. 1996)); Taylor v. Rodriguez, 238 F.3d 188,

194 (2d Cir. 2001) (finding that "some evidence" standard was not satisfied where hearing

---

[5]  Although Washington prevailed in his Article 78 proceeding challenging the harassment
determination, the state court that considered his challenge was required by New York law to
determine whether the deputy superintendent's finding was supported by "substantial evidence."
Washington v. Selsky, 48 A.D.3d 864, 865 (3d Dept. 2008). "This requirement is sterner than
the 'some evidence' standard necessary to afford due process." Sira, 380 F.3d at 76 n.9 (quoting
Hill, 472 U.S. at 449). Accordingly, the fact that Washington prevailed in his Article 78
proceeding does not establish that he has a valid federal claim under the Due Process Clause.

officer stated that she relied on the statements of confidential informants and on "an incident on

July 27, 1994," no details of which were discussed in the findings); <u>Luna</u>, 356 F.3d at 489

(standard not satisfied where "the 'evidence' consisted solely of a bare accusation by a victim

who then refused to confirm his initial allegations").

       Here, the primary dispute is not about the content of the exchange between

Washington and Officer Chaboty on August 6, 2006, but rather Deputy Superintendent Gonyea's

interpretation of that exchange.  Washington admits that he summoned Chaboty to the chaplain's

office, asked permission to give her a "present," and then gave her a copy of the Quran along

with interpretive notes.  (Cmplt. ¶ 7-10)  He contests only Gonyea's conclusion that this

exchange violated the prison rule against "communicating messages of a personal nature to an

employee."

       Given that Gonyea needed only "some evidence" to support his conclusion, the

proof presented at the disciplinary proceeding was adequate for Gonyea to find that Washington

had "communicated a message of a personal nature" to Offficer Chaboty.  Washington has not

argued that his actions related to his job at the prison or Chaboty's official duties, so his

interaction with her can only be understood as being "of a personal nature."  Moreover,

Washington referred to the book as a "present," and arranged to give it to Officer Chaboty when

the two were alone.   (Harben Decl., Ex. C, at 26; Cmplt. ¶ 7)  Chaboty testified that

Washington's use of the word "present" "deeply concerned" her, and Washington himself

acknowledged that this may have been a "bad choice of words."  (Harben Decl., Ex. C, at 26, 49)

Chaboty also testified that Washington exhibited an "eerie type of smile" when he handed her

the Quran and that she found his expression "unnerving."  (<u>Id.</u> at 29)  Given this evidence,

Gonyea's determination that Washington had communicated a message of a personal nature to Chaboty was not unreasonable or unfounded.

Washington further claims that the Disposition Report does not satisfy due process because, in the statement of evidence relied upon, Gonyea claimed that "Chaboty testified she felt intimidated," when in fact she gave no such testimony.  (Cmplt. ¶ 71)  The complete sentence at issue reads:  "Officer Chaboty testified she felt intimidated and uncomfortable with you trying to get her to go into the office to speak to you and you stating you had a present for her."  (Harben Decl., Ex. F)  Although Washington is correct that Chaboty never used the word "intimidated" in her testimony, she did testify that she and Washington were in a deserted wing of the prison when he gave her the Quran, that she was "deeply concerned by the fact that he presented the book in question as a present," and that "the whole situation and circumstances just did not seem appropriate or . . . normal to me."  (Harben Decl., Ex. C, at 26-28).  She also described the incident as "nothing like I've ever experienced either working as an officer or a civilian in this department."  (Id. at 29)  Accordingly, Gonyea's characterization of Chaboty's reaction as "intimidated and uncomfortable" was not unreasonable.

Finally, Washington emphasizes that Chaboty waited until the next day to prepare the disciplinary report, when ideally such a report should be prepared the same day as the incident.  (Cmplt. ¶ 32)  He also notes that Gonyea did not permit him to question Chaboty at the hearing as to whether she had driven to the prison on her day off to prepare the disciplinary report.  (Id. ¶ 33)  Neither of these issues has any bearing on the two relevant inquiries here, however, which are whether (1) Washington received the procedural protections required by Wolff, 418 U.S. at 563-67; and (2) the disciplinary officer's decision was supported by "some evidence."

Although this Court accepts Washington's argument that his confinement in the

SHU constituted an atypical and significant hardship, thus triggering the protections of the Due

Process Clause, this Court finds that he received the procedural protections required by Wolff

and was disciplined on the basis of a decision that was supported by reliable evidence.

Accordingly, Washington has not stated a claim for violation of his rights under the Due Process

Clause of the Fourteenth Amendment.

### III.   PLAINTIFF'S RETALIATION CLAIM

Washington also alleges that all three defendants – Gonyea, Chaboty and Granger

– violated his "rights to freedom of religious exercise and freedom of speech by writing [a] false

misbehavior report and memorandum against plaintiff in retaliation for plaintiff giving Chaboty a

religious book and two-page religious communication."  (Cmplt. ¶ 72)  The Court interprets this

claim to allege that Washington was entitled under the First Amendment to give a copy of the

Quran and his interpretive notes to Chaboty, and that his SHU confinement constitutes retaliation

for his exercise of First Amendment rights.

In order to plead a First Amendment retaliation claim, a plaintiff  "must advance

non-conclusory allegations establishing:  (1) that the speech or conduct at issue was protected,

(2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal

connection between the protected speech and the adverse action."  Dawes v. Walker, 239 F.3d

489, 492 (2d Cir. 2001).  Here, each defendant took adverse action against Washington:

Chaboty and Granger were involved in preparing a misbehavior report concerning the Quran

incident, and Gonyea imposed discipline based on the Quran incident.  It is equally clear that the

adverse action was causally related to the allegedly protected conduct:  the sole basis for

Washington's confinement in SHU was his act of giving Chaboty the Quran, and notes

concerning the Quran, as a "present."  Accordingly, the only remaining question is whether

14

Washington's conduct was protected by the free speech or the free exercise clauses of the First Amendment.

> **A.   Free Exercise Claim**

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003).  However, "because the religious rights of prisoners must be balanced against the interests inherent in prison administration, free exercise claims of prisoners are 'judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'" Pugh v. Goord, 571 F. Supp. 2d 477, 497 (S.D.N.Y. 2008) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)).

In order for a prisoner to succeed on a free exercise claim, he "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006). [6]  This showing does not require a plaintiff to show that the impeded religious practice is mandated by his religion, but it does require him to demonstrate that the religious practice "'is considered central or important to [his] practice of [his religion].'" Pugh, 571 F. Supp. 2d at 499 (quoting Ford, 352 F.3d at 393-94); see also Alameen, 894 F. Supp 440, 448 (E.D.N.Y. 1995) (stating that "to impose a substantial burden, government interference . . . must burden a belief central to a plaintiff's religious doctrine").

---

[6] In Ford, the Second Circuit noted that "the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims." Ford, 352 F.3d at 592.  However, in that case, the court "assum[ed] that the substantial burden test applies," because the plaintiff had not argued otherwise.  Similarly here, because Plaintiff has not argued that the substantial burden test is inapplicable, this Court has assumed that it applies.

Here, Washington has not pleaded that his act of giving Chaboty the Quran was "central or important" to his religious beliefs, or that he was compelled by his religion to give her a copy of the Quran. To the contrary, in the Complaint Washington states that he "wanted to give [Chaboty] the religious book . . . in order for her to read it herself and to learn about the religion of Islam," and that he acted "in response to her expressed interest to know about the religion of Islam." (Cmplt. ¶¶ 5-6) Accordingly, Washington attributes his desire to give Chaboty the Quran not to a religious obligation, but rather to his belief that she would be interested in reading it. This is not sufficient to make out a free exercise claim.

### B. <u>Statutory Claim</u>

The Complaint also alleges that Defendants violated Washington's "religious exercise rights to be free from substantial burden under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)." (Cmplt. § III) <u>See</u> 42 U.S.C. § 2000-cc1(a). The RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The Act provides that "the plaintiff shall bear the burden of persuasion on whether the . . . government practice that is challenged by the claim substantially burdens plaintiff's exercise of religion." 42 U.S.C. § 2000-cc-2(b).

Because Washington has not pled that the prison regulation or disciplinary proceeding at issue placed a substantial burden – or, indeed, <u>any</u> burden – on his religious practice, his RLUIPA claim fails.

C.    <u>Free Speech Claim</u>

Washington also claims that Defendants violated his right to free speech under the First Amendment.  While "'[a] prison inmate . . . retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system,'" <u>Shakur v. Selsky</u>, 391 F.3d 106, 113 (2d Cir. 2004) (quoting <u>Giano v. Senkowski</u>, 54 F.3d 1050, 1053 (2d Cir. 1995)), "the First Amendment is subject to severe curtailment when its protections are inconsistent with the limitations inherent in incarceration, especially those limitations necessary for the safety and security of the prison environment." <u>Rodriguez v. Phillips</u>, 66 F.3d 470, 478 (2d Cir. 1995); <u>see also</u> <u>Jones v. North Carolina Prisoners' Union</u>, 433 U.S. 119, 125 (1977) ("[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration").

Accordingly, when an inmate challenges a prison regulation on First Amendment grounds, "'the regulation is valid if it is reasonably related to legitimate penological interests.'" <u>Shakur</u>, 391 F.3d at 113 (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).  This inquiry involves consideration of four factors:  (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," <u>Turner</u>, 482 U.S. at 89 (quoting <u>Block v. Rutherford</u>, 468 U.S. 576, 586 (1984)); (2) "whether there are alternative means of exercising the right that remain open to prison inmates," <u>Turner</u>, 489 U.S. at 90; (3) "the impact accommodation of the asserted constitutional rights will have on guards and other inmates, and on the allocation of prison resources generally," <u>id.</u>; and (4) "the absence of ready alternatives."  <u>Id.</u>  "'The prisoner-plaintiff bears the burden of proving that [a] disputed regulation is unreasonable.'"  <u>Shakur</u>, 391 F.3d 106, 113 (quoting <u>Giano</u>, 54 F.3d at 1054).

17

The Second Circuit has cautioned that evaluation of penological interests is a fact-intensive inquiry that is not ordinarily amenable to resolution on a motion to dismiss.  See Shakur, 391 F.3d at 115 (reversing dismissal of a prisoner's First Amendment challenge to a prison rule banning written materials from "unauthorized organizations").  While "'there are regulations so obviously related to legitimate penological interests that challenges to them may be dismissed . . . based simply on (irrefutable) "common sense determinations,"'" id. at 115, n.4 (quoting Giano, 54 F.3d at 1059 (Calabresi, J., dissenting)), defendants in this case have not argued that this is such a case.  Indeed, Defendants have not articulated any penological interest served by the regulation barring communications of a personal nature to a corrections officer. Accordingly, this Court cannot find on the record before it that the regulation is reasonably related to legitimate penological interests.  As discussed below, however, to the extent that the defendants may have violated plaintiff's First Amendment rights, they are shielded from liability by the doctrine of qualified immunity.  See Part V, infra.

## IV.   PLAINTIFF'S CONSPIRACY CLAIM

The Complaint alleges that "[a]ll of the defendants conspired against plaintiff in order to punish him with S.H.U. confinement and transfer him to another correctional facility due to anti-Muslim sentiment."  (Cmplt. ¶ 47)  "In order to survive a motion to dismiss [a] § 1983 conspiracy claim, [plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Ciambrello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002) (citing Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)).  The Complaint names only state correctional officers, however, and Washington has not alleged facts demonstrating that a conspiracy existed between a state actor and a private party.  Accordingly, his conspiracy claim must be dismissed.

18

## V.   <u>QUALIFIED IMMUNITY</u>

Defendants argue that, to the extent they violated Washington's constitutional rights, they are shielded from liability by qualified immunity.  This argument will be addressed only in connection with Washington's free speech claim, because that is the only claim that is adequately pled.

The doctrine of qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Rodriguez</u>, 66 F.3d at 475 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "A right is clearly established when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  <u>Connel v. Signoracci</u>, 153 F.3d 74, 80 (2d Cir. 1998) (quoting <u>Harlow</u>, 457 U.S. at 818)).  "At the motion to dismiss stage of a civil damages action, a defendant is entitled to the shield of qualified immunity if the allegations of the complaint fail to state a claim that his conduct violated [a clearly established right]."  <u>Charles W. v. Maul</u>, 214 F.3d 350, 356-57 (2d Cir. 2000).

The Second Circuit uses a three factor test to determine whether a right is clearly established.  It considers "[f]irst, whether [the right] is 'defined with reasonable specificity'; second, whether 'the decisional law of the Supreme Court or the appropriate circuit court has clearly established the right'; [and] third, 'whether in light of preexisting law the unlawfulness of the defendant official's actions is apparent.'"  <u>Id.</u> at 357 (quoting <u>Francis v. Coughlin</u>, 891 F.2d 43, 46 (2d Cir. 1989)); <u>see also</u> <u>Anderson v. Recore</u>, 317 F.3d 194, 197 (2d Cir. 2003).

As noted above, significant restrictions on inmates' speech are constitutionally permissible in the prison environment.  <u>See</u> <u>Jones</u>, 433 U.S. at 125 ("The fact of confinement and

the needs of the penal institutional impose limitations on constitutional rights, including those

derived from the First Amendment, which are implicit in incarceration.").  The Second Circuit

has found, for example, that there is no "clearly established right" to "approach[] and speak out

against a corrections officer when the officer is . . . engaged in disciplining another inmate."

Rodriguez, 66 F.3d at 478.  This is because, "[w]hile case law establishes that prisoners retain

limited First Amendment rights, no case offers any suggestion that the First Amendment may

trample the concerns of safety and security that are paramount in the prison setting."  Id. at 479.

Here, an inmate's "communicating messages of a personal nature" to a

corrections officer raises obvious safety and security concerns.  In order for corrections officers

to maintain security and order within a prison, they must maintain professional distance from the

inmates.  Limiting or prohibiting personal communications enables penal institutions to preserve

that necessary distance between inmates and guards.  As in Rodriguez, this Court is aware of no

case suggesting that inmates have a right to communicate messages of a personal nature to

corrections officers.  Accordingly, this Court cannot find that Washington's punishment under

that regulation violated a "clearly established" right, and Defendants are entitled to qualified

immunity.[7]

---

[7]  Because Washington has not stated a claim on which relief can be granted, it is unnecessary to
address Defendants' remaining arguments concerning collateral estoppel, lack of personal
involvement, and Eleventh Amendment immunity.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Complaint is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 21) and to close this case. Any pending motions are moot.

The Clerk of the Court is further directed to send a copy of this Order, via certified mail, to Plaintiff Anthony Washington, 92-B-0151, Fishkill Correctional Facility, P.O. Box 1245, Beacon, NY, 12508.

Dated: New York, New York
       December 30, 2010

                        SO ORDERED.

                        _Paul G. Gardephe_
                        Paul G. Gardephe
                        United States District Judge