UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY WASHINGTON,

             Plaintiff,

-against-

TAMMI CHABOTY,
PAUL GONYEA, and
KEITH GRANGER,

             Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 27, 2015
           30

**MEMORANDUM
OPINION & ORDER**

09 Civ. 9199 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This is a Section 1983 case in which pro se Plaintiff Anthony Washington alleges

that Defendants – corrections officers and supervisors at the Woodbourne Correctional Facility

("Woodbourne") – violated his constitutional rights. (Am. Cmplt. (Dkt. No. 20) ¶¶ 71-74) The

Amended Complaint asserts that Washington received a sentence in the Special Housing Unit at

Woodbourne in retaliation for engaging in religious practices, and that he was denied access to

religious services and classes while serving that sentence. (Id. at 3, ¶¶ 42, 45, 71-73) As a result

of earlier rulings by this Court and the Second Circuit, the only remaining claims are for First

Amendment retaliation and denial of Washington's First Amendment right to freely exercise his

religion.

        Defendants have moved for summary judgment on Plaintiff's remaining claims,

arguing, inter alia, that Washington failed to exhaust his administrative remedies, that the

undisputed facts demonstrate that Washington was not disciplined for engaging in religious

activities, and that Defendants are entitled to qualified immunity. (Defendants' Memorandum in

Support of Summary Judgment ("Def. Br.") (Dkt. No. 55) at 1)  For the reasons stated below,

Defendants' motion will be granted in part and denied in part.

## BACKGROUND[1]

## I.    FACTUAL BACKGROUND AND GRIEVANCE PROCEEDINGS

In January 2006, Defendant Tammi Chaboty – a Woodbourne corrections officer

– asked Washington – then an inmate at Woodbourne – whether he could provide her with

information about Islam. (Plaintiff's Affirmation in Opposition to Motion for Summary

Judgment ("Pltf. Aff.") (Dkt. No. 51) ¶¶ 11-12)  Washington had converted to Islam in 1990, and

was an observant Muslim from that time until his release from prison in 2011.  (Id. ¶ 5)

Washington gave Chaboty "a few pamphlets" at that time, and the next day he gave her a book

entitled A Brief Illustrated Guide to Understanding Islam.  (Id. ¶¶ 13-18)  No one else was in the

room when Washington gave Chaboty the book.  (Id. ¶ 17)  Over the next seven months,

Washington and Chaboty had "more than a few" conversations about religion.  (Id. ¶¶ 19-22)  In

March 2006, during a conversation that lasted "at least 30 minutes," Chaboty asked Washington

"why Muslims were so violent."  (Id. ¶¶ 19-20)  Chaboty also requested, and Washington

provided, information about Islamic views of euthanasia.  (Id. ¶ 22)

On the evening of August 6, 2006, Washington was working as a clerk at the

Woodbourne Islamic Affairs Office ("IAO").  (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶¶ 2, 4)[2]  At

---

[1] Familiarity with this Court's prior dismissal order (Washington v. Gonyea, No. 09 Civ. 9199 (PGG), 2011 WL 102714 (S.D.N.Y. Jan. 10, 2011)) and with the Second Circuit's decisions (Washington v. Gonyea, 731 F.3d 143, 144 (2d Cir. 2013); Washington v. Gonyea, 538 F. App'x 23 (2d Cir. 2013)) is assumed.

[2] To the extent that this Court relies on facts drawn from Defendants' Local Rule 56.1 statement, it has done so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff

2

about 9:00 p.m., Washington twice asked Defendant Chaboty, who was at her post near the IAO,
if he could see her for a minute in order to give her a "present." (Id. ¶¶ 3-4; Pltf. R. 56.1 Resp.
(Dkt. No. 52) ¶ 4) Chaboty came to the office,[3] and Washington gave her a copy of the Quran
while she stood in the doorway. (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶ 5; Pltf. R. 56.1 Resp. (Dkt.
No. 52) ¶ 7; Pltf. Aff. (Dkt. No. 51) ¶ 27) Inside the book, Washington had inserted a two-page
typed informational statement about the Quran, which was intended "to help Chaboty in its
reading." (Pltf. Aff. (Dkt. No. 51) ¶ 24) Chaboty accepted the book and then returned to her
post. (Pltf. R. 56.1 Resp. (Dkt. No. 52) ¶ 6)

     Defendants claim that no other staff member was in the vicinity when Washington

gave Chaboty the Quran, but Washington states that Chaboty was "in the clear view of two

[other] corrections officers." (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶ 7; Pltf. R. 56.1 Resp. (Dkt. No.

52) ¶ 7) Chaboty states that she felt "very uncomfortable" and believed "that [she] could

potentially be in danger." (Declaration of Tammi Chaboty ("Chaboty Decl.") (Dkt. No. 59) ¶ 9)

Washington was smiling at her in a fashion that was "eerie and unnerving." (Id.) Washington

disputes Chaboty's account. (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶¶ 7-8; Pltf. R. 56.1 Resp. (Dkt.

No. 52) ¶¶ 7-8)

---

disagrees with Defendants' characterizations of the cited evidence, and has presented an
evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.
Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual
inferences in non-movant's favor in deciding summary judgment motion).

[3] Washington claims that he asked Chaboty "if [he] could give her a present . . . and she said,
'What is it?'" (Pltf. Aff. (Dkt. No. 51) ¶ 27) Washington maintains that "Chaboty did not tell
[him] that [he] could not give her the present or that [his] conduct was suspicious in any way."
(Id. at ¶ 28) Washington also asserts that he and Chaboty said "good night" to each other when
he left the office at 9:30 p.m. (Id. at ¶ 30) Chaboty mentioned to him that she had the next few
days off from work. (Id.) Chaboty allegedly left the prison that night without reporting the
incident. (Id. at ¶ 29)

At 9:30 the next morning – August 7, 2006 – Defendant Keith Granger

approached Washington and ordered a corrections officer to frisk Washington, handcuff him, and escort him to the Special Housing Unit ("S.H.U."). (Pltf. Aff. (Dkt. No. 51) ¶ 35) At the S.H.U., Washington was strip-searched and put in a cell. (Id.) Granger allegedly asked Washington about his encounter with Chaboty, and told Washington that Granger would be writing a misbehavior report against Washington. (Id. ¶¶ 36-39)

On August 7, 2006, Chaboty and Granger signed a misbehavior report charging Washington with soliciting, stalking, and "harassment," based on his "communicating messages of a personal nature to an employee."[4] (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶¶ 9-10; Pltf. R. 56.1 Resp. (Dkt. No. 52) ¶¶ 9-10) Between August 11 and August 21, 2006, Defendant Paul Gonyea, then a deputy superintendent at Woodbourne, presided over a Tier III disciplinary hearing regarding the charges, at which Washington, Chaboty, and Granger testified. (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶ 11; Declaration of Paul Gonyea ("Gonyea Decl.") (Dkt. No. 57) ¶¶ 3-4) On August 21, 2006, at the conclusion of the hearing, Deputy Superintendent Gonyea found Washington not guilty of the stalking and soliciting charges, but found him guilty of violating "Rule 107.11, harassment verbal by gesture, also . . . comments of [a] personal nature to employee[]." (Gonyea Decl. (Dkt. No. 57) Ex. B at 50)

"Rule 107.11 is part of Rule Series 107, which addresses an inmate's 'Interference with an Employee or Other Person.'" Washington v. Gonyea, 538 F. App'x 23, 26 (2d Cir. 2013) (citing 7 N.Y.C.R.R. § 270.2(B)(8)). Rule 107.11 provides that

---

[4] "Communicating messages of a personal nature to an employee" is a form of "harassment" under Prison Rule 107.11. Conduct prohibited by this rule "includes, but is not limited to, using insolent, abusive, or obscene language or gestures, or writing or otherwise communicating messages of a personal nature to an employee." 7 N.Y.C.R.R. 270.2(B)(8)(ii); see also (Harben Decl. (Dkt. No. 56) Ex. C at 42).

4

"[a]n inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures, or writing or otherwise communicating messages of a personal nature to an employee. . . ."

Id. (quoting 7 N.Y.C.R.R. § 270.2(B)(8)(ii)).

In finding Washington guilty of a Rule 107.11 violation, Gonyea stated:

I found your conduct in this incident was harassing [in] that you asked to speak to the officer but you did not go to her desk. You called her and gestured for her to go into the office you were at. No one else was in the area at that time. You presented to the officer that you had a present for her. That was a message of a personal nature.

(Gonyea Decl. (Dkt. No. 57) Ex. B at 51)

Gonyea also summarized the evidence he had relied on:

The evidence I relied upon is the following: the written report of Officer Chaboty and her verbal testimony that you asked to talk to her, that you remained in the Muslim office and . . . nodded for her to go into the office. . . . Officer Chaboty testifieds she felt intimidated and uncomfortable with you trying to get her to go into the office to speak to you, and you stating that you had a present for her.

(Id. at 50-51)

Gonyea imposed a disciplinary sanction of 65 days in the Special Housing Unit[5]

and a corresponding loss of privileges, including the privilege of attending congregate religious

services. (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶¶ 13, 16; Am. Cmplt. (Dkt. No. 20) ¶ 37).

Washington alleges that Gonyea "stopped the recording [at the conclusion of the hearing] and

told [Washington that] he only found [Washington] guilty . . . in order to separate him from staff

and transfer him." (Am. Cmplt. (Dkt. No. 20) ¶ 39) Gonyea allegedly told Washington that "he

---

[5] In the Amended Complaint, Washington alleges that he was "forced to be in an unfurnished cell for at[]least 23 hours a day," that he was "given smaller rations of mess[]hall food and denied group meals," and that he was "limited to three (3) five-minute showers a week, and escorted everywhere (even to showers and recreation) shackled." (Am. Cmplt. ¶ 42) Washington further alleges that "[t]hese punitive conditions do not exist in the general population," and that he found "the conditions in Woodbourne's S.H.U. [to be] extremely harsh." (Am. Cmplt. ¶ 42-43)

knew [Washington] was not guilty of the charges but he had to impose the penalty of 65 days in order to justify transferring [Washington] to another facility." (Pltf. Aff. (Dkt. No. 51) ¶ 63)

Washington appealed the outcome of the Tier III disciplinary hearing, but Gonyea's decision was affirmed in October 2006. (Am. Cmplt. (Dkt. No. 20) ¶ 41; Pltf. Aff. (Dkt. No. 51) ¶ 68; Declaration of Jeb Harben ("Harben Decl.") (Dkt. No. 56) Ex. B at 1) On January 18, 2007, Washington filed an Article 78 petition in Supreme Court of the State of New York, Albany County, challenging the Tier III determination. (Am. Cmplt. (Dkt. No. 20) ¶ 59; Pltf. Aff. (Dkt. No. 51) ¶ 80) The Supreme Court transferred the case to the Appellate Division, Third Department.

On February 14, 2008, that court granted Washington's petition and annulled the August 21, 2006 disciplinary determination, ordering that it be expunged from Washington's institutional record. Washington v. Selsky, 48 A.D. 3d 864, 865 (3d Dept. 2008). Noting that Chaboty admitted that she had had previous conversations with Washington about religion, and that there was no evidence that Washington had "engaged in any inappropriate or disrespectful behavior [to her]," the court found that the disposition at the Tier III hearing was not supported by substantial evidence. Id. The court commented that Washington's "conduct appears to have been a continuation of a cordial relationship between the officer and petitioner." Id.

On March 13, 2008, after the Third Department had annulled the disciplinary determination, Washington filed a grievance (No. SPT-43428-08), alleging violations of his constitutional rights, including the First Amendment claims alleged here.[6] (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 66; Pltf. Aff. (Dkt. No. 51) ¶ 83; Inmate Grievance Complaint (Dkt. No. 18) at 14-17) On March 19, 2008, the Inmate Grievance Resolution Committee ("IGRC") dismissed

---

[6] This grievance did not allege that Washington had been denied religious services while housed in the S.H.U. (Inmate Grievance Complaint (Dkt. No. 18) at 14-17)

and closed the grievance, reasoning that Washington had exhausted all administrative remedies through disciplinary appeals. (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 67; Pltf. Aff. (Dkt. No. 51) ¶ 84; Response of IGRC (Dkt. No. 18) at 18)  Washington appealed the IGRC decision to the Inmate Grievance Program Supervisor, who affirmed the decision on March 25, 2008.  (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 68; Pltf. Aff. (Dkt. No. 51) ¶ 85; IGRC Supervisor Dismissal Review (Dkt. No. 18) at 19)  On April 10, 2008, Washington filed a second grievance (No. SPT-43671-08) challenging the IGRC dismissal of his first grievance.  (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 69; Pltf. Aff. (Dkt. No. 51) ¶ 86; Central Office Review Committee Decision (Dkt. No. 18) at 20) Washington pursued that grievance through the IGRC to the superintendent and ultimately to the Central Office Review Committee, which "uph[eld] the determination of the Superintendent" and affirmed the decision to dismiss the original grievance.  (Am. Cmplt. (Dkt. No. 20) 4, ¶ 70; Pltf. Aff. (Dkt. No. 51) ¶ 87; CORC Decision (Dkt. No. 18) at 20)  The CORC concluded that the original grievance, No. SPT-43428-08, "was correctly dismissed and closed by the IGRC in accordance with Directive #4040, Section 701.5(4)(i)(c)(2)."  (CORC Decision (Dkt. No. 18) at 20)

## II.    PROCEDURAL HISTORY

Washington filed the instant action on November 5, 2009, alleging that Defendants unconstitutionally retaliated against him for exercising his First Amendment rights to free exercise of religion and free speech, denied him due process in violation of Section 1983, conspired to deprive him of his constitutional rights, in violation of 42 U.S.C. § 1985(3), and substantially burdened his free exercise of religion in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  (Am. Cmplt. (Dkt. No. 20) at 3, 5, ¶¶ 71-74)

7

Defendants moved to dismiss, and this Court granted their motion. Washington v. Gonyea, No. 09 Civ. 9199 (PGG), 2011 WL 102714 (S.D.N.Y. Jan. 10, 2011).

On September 10, 2013, the Second Circuit affirmed the dismissal of Washington's claims, except as to his First Amendment claims. See Washington v. Gonyea, 731 F.3d 143, 144 (2d Cir. 2013); Washington v. Gonyea, 538 F. App'x 23 (2d Cir. 2013). The Second Circuit held that this Court "erred in dismissing Washington's [First Amendment] retaliation claims on the basis that he failed to plead that his act of giving the Quran to Chaboty constituted an exercise of his sincerely held religious beliefs." Gonyea, 538 F. App'x at 26. The Second Circuit reasoned that Washington had alleged that he "felt a sincere religious obligation to give the Quran to Chaboty." Id. He had alleged in the Amended Complaint that he "wanted to give Chaboty the Quran 'in response to her expressed interest to know about the religion of Islam,'" and that "he felt that he would be remissed [sic] not to give her the book as it is the primary source of Islam." Id. Moreover, in his affidavit opposing Defendants' motion to dismiss, Washington had stated that he "believes it to be his 'religious duty to inform others about the religion of Islam, especially those who inquire about it.'" Id.

The Second Circuit concluded that "while the contours of the burden standard are not precisely drawn . . . the conduct alleged here – that Washington was severely punished for engaging in protected activity – rises to the level of a substantial burden on the free exercise of religion." Id. The Second Circuit also observed that "Washington has plausibly alleged that the officers' actions were not reasonably related to legitimate penological interests." Id. at 27.

The Second Circuit also determined that Washington had "adequately pled a violation of his First Amendment [free exercise] rights," having alleged that "he was denied religious services while in [the S.H.U.] pursuant to the discipline imposed by Gonyea." Id. The

8

court found that "a liberal reading of the complaint gives rise to a plausible inference that Chaboty and Granger were involved either directly or indirectly[ in that alleged free exercise violation]." Id. The Second Circuit directed this Court to "allow Washington leave to amend his pleadings to add additional defendants if requested." Id.

Finally, the Circuit Court determined that Defendants had not demonstrated that they were entitled to qualified immunity, because "Washington ha[d] plausibly alleged that [they had] acted with an improper retaliatory motive." Id.

On remand, this Court granted Washington leave to amend his pleadings, but he chose not to amend. (Nov. 11, 2013 Ltr. (Dkt. No. 39)) On May 30, 2014, Defendants moved for summary judgment. (Dkt. No. 53)

## DISCUSSION

## I. LEGAL STANDARD

Summary judgment is warranted when a moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

9

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

Because Plaintiff is proceeding pro se, this Court is required to read his opposition papers liberally. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed.'" (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Accordingly, this Court has construed Washington's papers "'to raise the strongest arguments that [they] suggest.'" Fulton v. Goord, 591 F.3d 37, 43 (2009) (quoting Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001)).

## II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A.    Applicable Law

The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Giano v. Goord, 380 F.3d 670, 675 (2d Cir. 2004) (quoting Porter v.

10

Nussle, 534 U.S. 516, 532 (2002)). "[A]ll claims relating to 'prison conditions,' including

retaliation claims, are subject to the PLRA's exhaustion requirement." Id., at 672 (citing Porter,

534 U.S. 516). "[C]ompliance with state procedural rules is necessary to achieve '[t]he benefits

of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity

to consider the grievance.'" Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (second and

third alterations in original) (quoting Woodford v. Ngo, 548 U.S. 81, 95 (2006)).

        "Section 1997e(a) requires 'proper exhaustion,' which 'means using all steps that

the agency holds out, and doing so properly (so that the agency addresses the issues on the

merits).'" Hernandez v. Coffey, 582 F.3d 303, 305 (2d Cir. 2009) (quoting Woodford, 548 U.S.

at 90 (internal quotation marks omitted) (emphasis in original)). "[B]ecause 'it is the prison's

requirements, and not the PLRA, that define the boundaries of proper exhaustion[,]' . . . [t]he

exhaustion inquiry . . . requires that [the court] look at the state prison procedures and the

prisoner's grievance to determine whether the prisoner has complied with those procedures."

Espinal, 558 F.3d at 124 (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

        Here, "the PLRA 'requires complete exhaustion in accordance with the

administrative procedures within the New York State Department of Correctional Services

('DOCS').'" Robinson v. Henschel, No. 10 Civ. 6212 (PGG), 2014 WL 1257287, at *10

(S.D.N.Y. March 26, 2014) (quoting Muhammad v. Pico, No. 02 Civ. 1052 (AJP), 2003 WL

21792158, at *7 (S.D.N.Y. Aug. 5, 2003)).

> The regular DOCS grievance procedure consists of three tiers.  First the inmate
> files a level 1 grievance . . . with the Inmate Grievance Resolution Committee
> ("IGRC") . . . Next, the inmate has . . . to appeal the IGRC decision to the
> superintendent of the facility . . . The inmate's final opportunity for resolution of
> his grievance is to appeal to the [Central Office Review Committee, also known
> as] CORC. . . .

Hemphill v. New York, 380 F.3d 680, 682 (2d Cir. 2004).

11

However, "DOCS regulations also provide a list of 'Non-grievable issues.'
7 N.Y.C.R.R. § 701.3(e). Listed among them is 'an individual disposition or disposition
resulting from a disciplinary proceeding,'" Rosales v. Fischer, No. 07 Civ. 10554 (LAP) (DFE),
2009 WL 928260, at *7 (S.D.N.Y. Mar. 31, 2009) (quoting 7 N.Y.C.R.R. § 701.3(e)(2)), as well
as "[a]n individual decision or disposition of any current or subsequent program or procedure
having a written appeal mechanism which extends review to outside the facility." 7 N.Y.C.R.R.
§ 701.3(e)(1) and (2). "Similarly, DOCS Directive 4040 states, inter alia, that '[t]he individual
decisions or dispositions of any current or subsequent program or procedure having a written
appeal mechanism which extends review to outside the facility shall be considered non-
grievable. Specifically, the individual decisions or dispositions of the following are not
grievable: . . . disciplinary proceedings.'" Giano, 380 F.3d at 678.

The Second Circuit has observed that "Section 701.3(e)(1) and Directive 4040 do
not differentiate clearly between grievable matters relating to disciplinary proceedings, and non-
grievable issues concerning the 'decisions or dispositions' of such proceedings." Id. at 679. In
distinguishing between claims requiring Inmate Grievance Program exhaustion from those that
may be exhausted through disciplinary appeal, "[g]enerally, where a court has found
nonexhaustion of a claim despite the appeal of a disciplinary hearing decision, the plaintiff had
not raised objections in the appeals process to the behavior underlying the claim. . . ." Farid v.
Ellen, No. 01 Civ. 8292 (PKC), 2003 WL 23018805, at *2 (S.D.N.Y. Dec. 23, 2003) aff'd, 593
F.3d 233 (2d Cir. 2010) (quoting Rivera v. Goord, 253 F. Supp. 2d 735 (S.D.N.Y. 2003); see
also Thomas v. Connolly, No. 10 Civ. 2401 (PAC) (MHD), 2012 WL 3776698, at *6 (S.D.N.Y.
Apr. 10, 2012) report and recommendation adopted, No. 10 Civ. 2401 (PAC) (MHD), 2012 WL
3758457 (S.D.N.Y. Aug. 30, 2012) ("complaints about the handling of a disciplinary hearing

12

must be addressed by an appeal of the hearing officer's decision rather than through the grievance process").

        In certain circumstances, however, courts have deemed a disciplinary appeal inadequate to exhaust a claim under the PLRA. Inmate Grievance Program exhaustion has been required, for example, where an inmate alleges retaliation, including retaliation based on the filing of an allegedly false misbehavior report. See, e.g., Mateo v. Gundrum, No. 10 Civ. 1103 (GLS) (TWD), 2013 WL 5464722, at *2, 4, 8 (N.D.N.Y. Sept. 30, 2013) (finding that plaintiff had not exhausted administrative remedies with respect to retaliation claim involving false misbehavior report where he had not filed a grievance as to that issue, even though in his disciplinary appeal he "stated that he believed that Defendant Gundrum wrote the misbehavior report 'in retaliation [ ] for his grievances and lawsuits against correction staff[ ] officers'"); Singh v. Goord, 520 F. Supp. 2d 487, 497-98 (S.D.N.Y. 2007) (plaintiff appealed disciplinary sanction that had been imposed on him for refusing to perform a work assignment that conflicted with his religious beliefs; held that plaintiff was required to file a grievance concerning his objection to the work assignment after the disciplinary sanction was overturned on appeal); Scott v. Gardner, 287 F. Supp. 2d 477, 489 (S.D.N.Y. 2003) ("Although completion of the disciplinary appeal process may satisfy the exhaustion requirement with respect to [plaintiff's] claims that he was denied due process in the disciplinary proceedings, allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved."), adhered to on reconsideration in part, No. 02 Civ. 8963 (RWS), 2005 WL 984117 (S.D.N.Y. Apr. 28, 2005).[7]

---

[7] Courts in this district have held that retaliation claims based on the filing of false misbehavior reports are grievable. See, e.g., Salvatierra v. Connolly, No. 09 Civ. 3722 (SHS) (DF), 2012 WL 996944, at *4 (S.D.N.Y. Feb. 29, 2012), report and recommendation adopted, No. 09 Civ. 3722 (SHS), 2012 WL 1003562 (S.D.N.Y. Mar. 26, 2012) (holding that plaintiff failed to exhaust administrative remedies on his claim alleging "retaliatory preparation of a false misbehavior

13

Finally, "[f]ailure to exhaust administrative remedies under the PLRA is an affirmative defense, and thus the defendants have the burden of proving that [Washington's] claims have not been exhausted." Bennett v. James, 737 F. Supp. 2d 219 (S.D.N.Y. 2010) (citation omitted); see also Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004) ("It is now well-settled in this circuit that exhaustion under the PLRA . . . is an affirmative defense.") (citing Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999)). "It is therefore a defendant's burden to prove the defense either in a motion for summary judgment or at trial." Gonzalez v. Officer in Charge of Barber Shop on Duty on May 13, 1999, No. 99 Civ. 3455 (DLC), 2000 WL 274184, at *3 (S.D.N.Y. Mar. 13, 2000) (citing Blissett v. Coughlin, 66 F.3d 531, 538 (2d Cir.1995)).

## B.    Analysis

Here, Washington has alleged First Amendment retaliation based on a disciplinary sanction imposed on him for engaging in constitutionally protected conduct. Washington appealed the disciplinary sanction, and after that decision was annulled by the Third Department, he filed a grievance (No. SPT-43428-08), which includes the First Amendment retaliation claims alleged here. (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 66; Pltf. Aff. (Dkt. No. 51) ¶ 83; Inmate Grievance Complaint (Dkt. No. 18) at 14-17) The IGRC dismissed and closed that grievance, reasoning that Washington had already exhausted his administrative remedies through

---

report" where he had neither filed a grievance nor appealed his disciplinary determination); Greene v. Mazzuca, 485 F. Supp. 2d 447, 452-53 (S.D.N.Y. 2007) ("Because Greene failed to institute a grievance within the DOCS system and exhaust his administrative remedies with respect to his retaliation claim [based on the filing of a false misbehavior report], that claim must be dismissed."); Varela v. Demmon, 491 F. Supp. 2d 442, 449 (S.D.N.Y. 2007) (plaintiff exhausted First Amendment retaliation claim as to false misbehavior reports that resulted in disciplinary sanction by filing a grievance that was "sufficient to alert prison officials to the nature of the Varela's claim with respect to the misbehavior report"); Cherry v. Selsky, No. 99 Civ. 4636 (HB), 2000 WL 943436, at *7 (S.D.N.Y. July 7, 2000) ("[An officer's] filing of an allegedly false misbehavior report would constitute a grievable matter. Specifically, prisoners are permitted to file grievances regarding '[a]llegations of employee misconduct meant to annoy, intimidate or harm an inmate.'") (quoting 7 N.Y.C.R.R. § 701.2(e)).

his disciplinary appeal.  (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 67; Pltf. Aff. (Dkt. No. 51) ¶ 84;

Response of IGRC (Dkt. No. 18) at 18)  Washington appealed that determination, however, and

the Inmate Grievance Program Supervisor affirmed the IGRC decision.  (Am. Cmplt. (Dkt. No.

20) at 4, ¶ 68; Pltf. Aff. (Dkt. No. 51) ¶ 85; IGRC Supervisor Dismissal Review (Dkt. No. 18) at

19)  Washington then filed a separate, second grievance (No. SPT-43671-08) challenging the

IGRC's dismissal of his first grievance.  (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 69; Pltf. Aff. (Dkt.

No. 51) ¶ 86)  Washington pursued that grievance through the IGRC to the superintendent and

ultimately to the Central Office Review Committee, which "uph[eld] the determination of the

Superintendent" and affirmed the decision to dismiss the original grievance.[8]  (Am. Cmplt. (Dkt.

No. 20) 4, ¶ 70; Pltf. Aff. (Dkt. No. 51) ¶ 87; CORC Decision (Dkt. No. 18) at 20)

     Defendants do not seriously dispute that Washington pursued his grievance

regarding First Amendment retaliation through the highest level of administrative review.[9]

Instead, Defendants argue that Washington was required to assert his First Amendment claims in

appealing his disciplinary sanction.  Because Washington's disciplinary appeal raised only issues

of due process and substantial evidence, Defendants contend that he has not exhausted his

administrative remedies.  (Def. Br. (Dkt. No. 55) at 9)  There are several problems with

Defendants' argument.

     As an initial matter, personnel at all three levels of the administrative review

process have issued decisions saying that Washington exhausted his administrative remedies

---

[8] The CORC concluded "that grievance SPT-43428-08 was correctly dismissed and closed by the IGRC in accordance with Directive #4040, Section 701.5(4)(i)(c)(2)."  (CORC Decision (Dkt. No. 18) at 20)

[9] Defendants' brief contains a throwaway line at the end of the exhaustion argument stating that "the record [does not] demonstrate that Plaintiff separately administratively exhausted [his First Amendment claims]."  (Def. Br. (Dkt. No. 55) at 9)  Defendants provide no explanation for this argument, nor do they provide any factual or legal support for it.

concerning his First Amendment claims during his disciplinary appeal. The IGRC dismissed and closed Washington's grievance, stating that he had already exhausted his administrative remedies through his disciplinary appeal. (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 67; Pltf. Aff. (Dkt. No. 51) ¶ 84; Response of IGRC (Dkt. No. 18) at 18) When Washington appealed, the Inmate Grievance Program Supervisor affirmed the IGRC's decision. (Am. Cmplt. (Dkt. No. 20) at 4, ¶ 68; Pltf. Aff. (Dkt. No. 51) ¶ 85; IGRC Supervisor Dismissal Review (Dkt. No. 18) at 19) When Washington pursued an appeal to the CORC, the CORC affirmed, stating that the IGRC had "correctly dismissed and closed" Washington's grievance. (CORC Decision (Dkt. No. 18) at 20) Defendants' argument here flies in the face of these determinations.

Moreover, Defendants have cited no law suggesting that Washington's failure to assert the First Amendment claims in the disciplinary appeal means that he is barred from raising these claims through the grievance process. Indeed, DOCS has previously taken the position that retaliation claims of the sort made here must be pursued through the grievance process after a disciplinary appeal. In Giano v. Goord, 380 F.3d 670, 678-79 (2d Cir. 2004), for example, plaintiff had pursued a disciplinary appeal that involved, inter alia, retaliation claims premised on the filing of false misbehavior reports. Id. at 674. Plaintiff read the DOCS regulations to require him to pursue these claims in a disciplinary appeal. Id. DOCS argued, however that plaintiff had misread its regulations, and that the inmate's retaliation claims were subject to dismissal for failure to exhaust administrative remedies available through the grievance process. Id. at 678-79. DOCS asserts the opposite position here, without explanation. See Def. Br. (Dkt. No. 55) at 9.

Defendants have not carried their burden of demonstrating that Washington failed to exhaust his administrative remedies. Accordingly, they are not entitled to summary judgment on Washington's First Amendment retaliation claims based on a failure to exhaust.

16

## III.   PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIMS

The Amended Complaint alleges that Chaboty and Granger violated

Washington's "rights to freedom of religious exercise . . . by writing [a] false misbehavior report

. . . against [him] in retaliation for [him] giving Chaboty a religious book and [a] two-page

religious communication." (Am. Cmplt. (Dkt. No. 20) ¶¶ 72-73)  As to Gonyea, the Amended

Complaint alleges that he violated Washington's "rights to freedom of religious exercise . . . by

punishing him with a false misbehavior report, . . . punishing him with 65 days S.H.U., and

transferring [him] to another facility in retaliation for plaintiff giving Chaboty a religious book

and two-page religious communication." [10]  (Am. Cmplt. (Dkt. No. 20) ¶ 71)  Consistent with the

Second Circuit's interpretation of the Amended Complaint and Washington's associated filings,

this Court understands Washington to be alleging that his act of giving the Quran and

interpretive notes to Chaboty was driven by his sincerely held religious beliefs, and that the

misbehavior report and S.H.U. sanction constitutes retaliation for his exercise of First

Amendment rights.[11]

---

[10]  Elsewhere in the Amended Complaint, Washington alleges that Defendants violated his "religious exercise rights to be free from substantial burden under the First Amendment . . . by punishing [him] in retaliation for engaging in religious practices with a false, unsubstantiated misbehavior report, imposing a penalty of 65 days confinement in special housing, transferring me to another facility, and placing adverse reports in my prison files which militated against receiving early parole release and programs. " (Am. Cmplt. (Dkt. No. 20) at 3)

[11]  Gonyea argues that the Second Circuit's affirmance of this Court's dismissal of Washington's due process claims against him is likewise dispositive as to Washington's First Amendment retaliation claims against Gonyea. (Def. Br. (Dkt. No. 55) at 10)  Nothing in the Second Circuit's decision supports that argument. Indeed, the Circuit reversed this Court's dismissal of Washington's First Amendment retaliation claims, explicitly finding that he had adequately pled each element of a First Amendment claim. Gonyea, 538 F. App'x at 26-27.  Because the elements of a due process claim and a First Amendment retaliation claim are quite different, the Second Circuit's ruling concerning the due process claim has no effect on Washington's First Amendment claims.  In any event, Washington has now submitted an affirmation that tracks the allegations in the Amended Complaint, and which raises material issues of fact as to whether Gonyea acted with retaliatory animus. See, e.g., (Pltf. Aff. (Dkt. No. 51) ¶¶ 58-64.

17

## A.    Applicable Law

"To prevail on a First Amendment retaliation claim brought pursuant to 42 U.S.C. § 1983, an inmate must demonstrate '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action.'" Gonyea, 538 F. App'x at 26 (quoting Espinal, 558 F.3d at 128); see also Holland v. Goord, 758 F.3d 215, 225 (2d Cir. 2014); Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (quoting Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)). "An inmate bears the burden of showing that 'the protected conduct was a substantial or motivating factor' in the prison officials' disciplinary decision." Holland, 758 F.3d at 225 (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).

"The defendant official then bears the burden of establishing that the disciplinary action would have occurred 'even absent the retaliatory motivation,' which he may satisfy by showing that the inmate 'committed the . . . prohibited conduct charged in the misbehavior report.'" Holland, 758 F.3d at 226 (quoting Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002)); see also Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ("DOCS may evade liability if it demonstrates that it would have disciplined or transferred [the inmate] '"even in the absence of the protected conduct."'") (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (quoting Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977))). "Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham, 89 F.3d at 79 (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994)); Roseboro v. Gillespie, 791 F. Supp. 2d 353, 367 (S.D.N.Y. 2011) (same); see also Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("[A] defendant may be entitled to

summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred. . . . The burden [thus] shifts to defendant to show it would have taken exactly the same action absent the improper motive."). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." Davidson v. Chestnut, 193 F.3d 144, 149 (2d Cir. 1999); see also Smith v. Conway, No. 10 Civ. 00824A(F), 2013 WL 4046290, at *14 (W.D.N.Y. Aug. 7, 2013) (same), aff'd, 582 F. App'x 45 (2d Cir. 2014); Davidson v. Desai, 817 F. Supp. 2d 166, 194 (W.D.N.Y. 2011) (same); Ramsey v. Goord, 661 F. Supp. 2d 370, 399 (W.D.N.Y. 2009) (same).

## 1. Protected Conduct

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that 'the disputed conduct substantially burden[ed] his sincerely held religious beliefs.'" Gonyea, 538 F. App'x at 26 (alteration in original) (quoting Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006)).[12] "In determining whether a prisoner's conduct is motivated by a sincerely held religious belief, we do not 'evaluate the objective reasonableness of the prisoner's belief;' . . . rather, our 'scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature,'" Id. (quoting Ford v. McGinnis, 352 F.3d 582, 590 (2d Cir. 2003)); see also Pugh v. Goord, 571 F. Supp. 2d 477, 498 (S.D.N.Y. 2008) ("'an individual claiming violation of free

---

[12] "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'" Holland, 758 F.3d at 220 (quoting Salahuddin, 467 F.3d at 274-75) (citing Ford, 352 F.3d at 592) In Ford, the court "assum[ed] that the substantial burden test applies," because the plaintiff had not argued otherwise. Ford, 352 F.3d at 592. Similarly here, because Washington has not argued that the substantial burden test is inapplicable, this Court has assumed that it applies.

exercise rights need only demonstrate that the beliefs professed are sincerely held and in the
individual's own scheme of things, religious.'") (quoting Ford, 352 F.3d at 588). "Determining
the sincerity of a prisoner's religious beliefs 'does not lend itself to a decision on summary
judgment.'" Houston v. Schriro, 2014 WL 6694468, at *10 (quoting Pugh, 571 F. Supp. 2d at
498).

### 2.     Adverse Action

As to the adverse action element, "'[o]nly retaliatory conduct that would deter a
similarly situated individual of ordinary firmness from exercising his or her constitutional rights
constitutes an adverse action for a claim of retaliation.'" Davis v. Goord, 320 F.3d 346, 353 (2d
Cir. 2003)) (quoting Dawes, 239 F.3d at 493); see also Espinal, 558 F.3d at 128 n.7 (noting that,
in the prison context, an adverse action is conduct by defendants "that would deter a similarly
situated individual of ordinary firmness from exercising . . . constitutional rights") (internal
quotation marks omitted).

### 3.     Causal Connection

"To establish a causal connection, '[a] plaintiff must allege facts suggesting that
the protected conduct was a substantial or motivating factor in the prison official's decision to
take action against him.'" Turner v. Sidorowicz, No. 12 Civ. 7048 (NSR), 2014 WL 641454, at
*10 (S.D.N.Y. Feb. 18, 2014) (alteration in original) (quoting Burton v. Lynch, 664 F. Supp. 2d
349, 367 (S.D.N.Y. 2009)).

> When prison disciplinary proceedings are alleged to be retaliatory, evidence that
> can lead to an inference of improper motive includes: (1) the temporal proximity
> of the [protected conduct] and the alleged retaliatory act; (2) the inmate's prior
> good disciplinary record; (3) vindication at a hearing on the matter; and (4)
> statements by the defendant regarding his motive for disciplining plaintiff.

20

Rivera, 253 F. Supp. 2d at 749 (citing Colon v. Coughlin, 58 F.3d 865, 872-73 (2d Cir. 1995); see also Turner, 2014 WL 641454, at *10 (applying same four factors in determining whether plaintiff had demonstrated a causal connection).

## B.      Analysis

Here, a reasonable jury could conclude that Washington's conduct was motivated by a sincerely held religious belief. Washington has submitted an affirmation stating that, "[a]s a Muslim, it is [his] religious obligation to inform about the religion of Islam those non-Muslims who wish to know about it." (Pltf. Aff. (Dkt. No. 51) ¶ 23) "[A]s a Muslim, [Washington felt that he] would be remiss [if he did] not . . . give [Chaboty] the [Quran] since it is the primary source of Islam," and given that "she had expressed an interest to know about the religion of Islam." (Id. ¶ 48) As the Second Circuit held, "while the contours of the burden standard are not precisely drawn . . . the conduct alleged here – that Washington was severely punished for engaging in protected activity – rises to the level of a substantial burden on the free exercise of religion." Gonyea, 538 F. App'x at 26 (citing Salahuddin, 467 F.3d at 275 n.5). Accordingly, a reasonable jury could conclude that Washington had engaged in protected conduct.

Washington has also offered sufficient evidence to demonstrate that he suffered an adverse action. The filing of the misbehavior report and the disciplinary sanction of 65 days in the S.H.U. constitute adverse actions that satisfy the second element of a retaliation claim. See Pidlypchak, 389 F.3d at 384 (filing of false misbehavior reports and sanction of three weeks in "keeplock" constitute adverse actions "that would deter a prisoner of ordinary firmness from [exercising his First Amendment] rights")); Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("Filing a false misbehavior report about [an inmate] . . . would deter a similarly situated person of ordinary firmness from exercising his First Amendment rights.").

21

Here, Chaboty and Granger were involved in preparing a misbehavior report concerning the Quran incident, and Gonyea imposed the S.H.U. sanction based on the Quran incident.

Washington has also offered evidence from which a reasonable jury could infer that the adverse actions were causally related to his allegedly protected conduct – i.e., that retaliatory animus was a "substantial or motivating factor" for Defendants' adverse actions. First, Washington has submitted an affirmation stating that Gonyea admitted to him that both his determination and the sanction Gonyea imposed at the conclusion of the disciplinary proceeding were pretextual. According to Washington, Gonyea told him that he "knew that [Washington] was not guilty of the charges[,] but he had to impose the penalty of 65 days in order to justify transferring [Washington] to another facility." (Pltf. Aff. (Dkt. No. 51) ¶ 63) Second, Washington has offered evidence demonstrating that the sanction imposed on him was much more severe than the punishment imposed on another inmate who committed the same infraction: giving a present of a personal nature to a corrections officer. (Id. ¶¶ 64-66)

According to Washington, another Woodbourne inmate – who gave a birthday card to a female corrections officer – received, at most, 30 days in "keeplock." (Id.) Moreover, that inmate was not transferred to another institution. (Id. at ¶ 66) Although Washington identifies the inmate and corrections officer by name (id. at ¶ 65), Defendants have not offered evidence rebutting Washington's assertion.[13]

---

[13] Defendants assert in their reply brief that "a cursory review of the DOCCS website" shows no record of the inmate identified by Washington. (Def. Reply Br. (Dkt. No. 62) at 7-8). Arguments made in a brief do not constitute evidence that this Court can rely on at summary judgment. See, e.g., Giannullo v. City of New York, 322 F.3d 139, 142 (2d Cir. 2003) ("[D]efendants' memorandum of law . . . is not evidence at all."); MM Ariz. Holdings LLC v. Bonanno, 658 F. Supp. 2d 589, 594 (S.D.N.Y. 2009) ("A brief is not evidence"); SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 315 n.6 (S.D.N.Y. 2000) ("'Statements by counsel in briefs are not evidence.'") (quoting Skyline Corp. v. NLRB, 613 F.2d 1328, 1337 (5th Cir.1980)).

22

There is also temporal proximity between Washington's distribution of religious materials and the misbehavior report and disciplinary sanction. See Espinal, 558 F.3d at 129 (a plaintiff bringing a claim of First Amendment retaliation "can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action"); Rauser v. Horn, 241 F.3d 330, 334 (3d Cir. 2001) (finding causal relationship where inmate "demonstrated a suggestive temporal proximity between his insistence on his First Amendment rights and his transfer and wage reduction"); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000) (suggestive timing is relevant to causation in retaliation case). Here, the misbehavior report was filed, and the disciplinary sanction was imposed, shortly after – and as a result of – Washington's act of giving Chaboty the Quran and his interpretive notes. Moreover, Washington's disciplinary record prior to this incident – reflecting approximately sixteen years in prison – was unblemished, and the disciplinary action at issue was annulled by the Third Department. See Rivera, 253 F. Supp. 2d at 749 ("inmate's prior good disciplinary record" and "vindication at a hearing on the matter" "can lead to an inference of improper motive").

Washington's First Amendment retaliation claims will not survive summary judgment, however, if Defendants can establish "that the disciplinary action would have occurred 'even absent the retaliatory motivation.'" Holland, 758 F.3d at 226 (quoting Gayle, 313 F.3d at 682); see also Graham, 89 F.3d at 81 ("[I]f, however, defendants meet their burden [by] showing that [plaintiff] would have been disciplined even in the absence of the protected conduct[,] summary judgment dismissing [plaintiff's] § 1983 claim would be appropriate.") Stated another way, "[o]nce the burden shifts to the defendants, [Washington's] presentation creates a triable issue of fact unless the defendants proffer an alternative basis for disciplining [Washington] that would apply to him even if his version of events were true." Graham, 89 F.3d at 81; see also

23

Carl v. Griffin, No. 08 Civ. 4981 (RMB) (MHD), 2011 WL 723553, at \*6 (S.D.N.Y. Mar. 2, 2011) ("Thus, even assuming retaliatory motive, [Defendants would be] entitled to summary judgment '[because] there were proper, non-retaliatory reasons for [Plaintiff's] punishment.'") (alterations in original) (quoting Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (quoting Graham, 89 F.3d at 81)). "'A defendant can meet this burden by demonstrating that there is no dispute that the plaintiff "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report."'" Wellington v. Langendorf, No. 12 Civ. 1019 (FJS) (DEP), 2015 WL 401313, at \*4 (N.D.N.Y. Jan. 28, 2015) (quoting Gayle, 313 F.3d at 682 (quoting Hynes, 143 F.3d at 657)). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." Davidson, 193 F.3d at 149.

Defendants argue that Washington "was not disciplined on the grounds of the religious conduct of the 'present' given to Chaboty, but rather, because he gave her any present at all and because of the circumstances surrounding his giving of the present, which created potential security concerns and caused defendant Chaboty to feel uncomfortable." (Def. Br. (Dkt. No. 55) at 1, 12) (emphasis in original). Defendants contend that "the charges were issued, and discipline imposed, because gift-giving by inmates to corrections staff (regardless of the intent behind the giving of such a gift) is prohibited for legitimate penological reasons, even gifts of marginal value such as a book, and because Plaintiff here created an uncomfortable – 'eerie' and 'unnerving' – situation for Chaboty that potentially implicated security concerns." (Id. at 11, 13)

As courts in this District have noted, however,

the degree of deference [afforded to judgments of prison officials] depends upon the circumstances. When prison officials act pursuant to a duty clearly imposed

24

upon them, where the rule they invoke is enforced regularly, and where its enforcement is essential to the maintenance of order and discipline, the deference is at its maximum. Where the action is discretionary, where the rule is not uniformly enforced, and where the rule is not directly related to order and discipline, the degree of deference that is appropriate is correspondingly reduced.

Nicholas v. Tucker, 89 F. Supp. 2d 475, 480 (S.D.N.Y. 2000), aff'd, 40 F. App'x 642 (2d Cir. 2002). In Nicholas, for example, the plaintiff inmate had received a misbehavior report and 60 days in "keeplock" for violating DOCS Rule 116.10, which forbids the use of State-owned computers for non-State business. Id. at 477. The inmate brought a First Amendment retaliation claim, alleging that these adverse actions were retaliation for his wearing religious headgear. Id. The district court denied defendants' summary judgment motion, because they had not established that plaintiff would have been disciplined even in the absence of retaliatory motive. Id. at 481. There was "substantial evidence that prison officials often did not enforce the directive" and it was "not intuitively obvious, and there certainly [wa]s no evidence, that the directive was essential or even particularly relevant to safety, order and discipline." Id. at 480-81; see also Rolon v. Ward, No. 05 Civ. 0168 (WCC), 2008 WL 4700705 (S.D.N.Y. Oct. 24, 2008), aff'd, 345 F. App'x 608, 611 (2d Cir. 2009) (summary judgment on First Amendment retaliation claim denied where plaintiff "raised a question of fact as to whether officers committing similar infractions received similar discipline").

Although Defendants argue that Washington was disciplined because he violated a prison rule prohibiting inmates from harassing corrections officers through the communication of personal messages, Washington has alleged facts suggesting that the adverse actions he suffered would not have occurred absent retaliatory animus. As discussed above, Washington has offered evidence that "[t]he penalty of 65 days [in the S.H.U. that he suffered] was much harsher than the penalty that was imposed upon another inmate at Woodbourne who gave a

25

female corrections officer a birthday card." (Pltf. Aff. (Dkt. No. 51) ¶ 64)  Defendants have not

rebutted Washington's claim that his punishment – 65 days in the S.H.U. – is atypical for

violations of the rule against communicating personal messages to prison staff.  Defendants have

thus not demonstrated that Washington would have received the same punishment if his conduct

had not involved protected activity.

The record also includes evidence demonstrating that the rule prohibiting

"communicating messages of a personal nature" to a corrections officer is not strictly enforced.

Washington's deposition testimony shows that he has had many conversations with numerous

corrections officers about personal topics and had never suffered any repercussions.  (Harben

Decl. (Dkt. No. 56) Ex. E at 25-30, 51-52; Pltf. Aff. (Dkt. No. 51) ¶¶ 12-22)  The inconsistent

application of prison Rule 107.11 undermines Defendants' argument that Washington would

have suffered the same adverse actions even absent his protect activity.

Finally, Washington has offered evidence that Gonyea admitted to him that "he

knew [Washington] was not guilty of the charges but [that Gonyea] had to impose the penalty of

65 days in order to justify transferring [Washington] to another facility." (Pltf. Aff. (Dkt. No.

51) ¶ 63)  A reasonable jury could infer from Gonyea's alleged admission that retaliatory animus

was in part responsible for the adverse actions Washington suffered.

For all these reasons, this Court concludes that genuine issues of material fact

exist as to Plaintiff's First Amendment retaliation claims.

## IV.   QUALIFIED IMMUNITY

The doctrine of qualified immunity "shields government officials from liability

for damages on account of their performance of discretionary official functions 'insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

26

reasonable person would have known.'" Rodriguez v. Phillips, 66 F.3d 470, 475 (1995) (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To assess a defendant's entitlement to

qualified immunity, a court must consider 'both the clarity of the law establishing the right

allegedly violated as well as whether a reasonable person, acting under the circumstances then

confronting a defendant, would have understood that his actions were unlawful.'"[14] Holland,

758 F.3d at 223 (quoting Hanrahan v. Doling, 331 F.3d 93, 98 (2d Cir. 2003) (per curiam)).

"However, 'where a more specific intent is actually an element of the plaintiff's claim as defined

by clearly established law, it can never be objectively reasonable for a government official to act

with the intent that is prohibited by law.'" Gonyea, 538 F. App'x at 27 (quoting Locurto v. Safir,

264 F.3d 154, 169 (2d Cir. 2001)).

           Where a government official has moved

> "for summary judgment asserting a qualified immunity defense in an action in
> which an official's conduct is objectively reasonable but an unconstitutional
> subjective intent is alleged, the plaintiff must proffer particularized evidence of
> direct or circumstantial facts . . . supporting the claim of an improper motive in
> order to avoid summary judgment."

Sheppard v. Beerman, 94 F.3d 823, 828 (2d Cir. 1996) (quoting Blue v. Koren, 72 F.3d 1075,

1084 (2d Cir.1995)); see also Locurto, 264 F.3d at 170 ("The Crawford-El[ v. Britton, 523 U.S.

574 (1998)] standard is entirely consistent with prior precedents from this Circuit that have held

a plaintiff need only 'show "particularized evidence of direct or circumstantial facts" supporting

---

[14] A three-factor test is used to determine whether a right is clearly established. Courts consider
"[f]irst, whether [the right] is 'defined with reasonable specificity'; second, whether 'the
decisional law of the Supreme Court or the appropriate circuit court has clearly established the
right'; [and] third, 'whether in light of preexisting law the unlawfulness of the defendant
official's actions is apparent.'" Charles W. v. Maul, 214 F.3d 350, 360 (2d Cir. 2000) (quoting
Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989)); see also Anderson v. Recore, 317 F.3d 194,
197 (2d Cir. 2003).

his claim of unconstitutional motive' in order to survive a motion for summary judgment on the defense of qualified immunity.") (quoting Sheppard, 94 F.3d at 170).

Here, material issues of fact preclude summary judgment on Defendants' qualified immunity defense as it pertains to Washington's First Amendment retaliation claim. As discussed above, Washington has proffered evidence demonstrating that the adverse actions he suffered were based in part on retaliatory animus. There are material issues of fact as to whether """it was objectively reasonable for [Defendants] to believe that [their] acts did not violate [Washington's] rights."""" Nicholas v. Tucker, No. 95 Civ. 9705 (LAK), 2001 WL 228413, at *2 (S.D.N.Y. March 8, 2001) (quoting Russell v. Coughlin, 910 F.2d 75, 78 (2d Cir. 1990) (quoting Robinson v. Via, 821 F.2d 913, 921 (2d Cir.1987)).

## V.   DENIAL OF RELIGIOUS SERVICES WHILE IN SPECIAL HOUSING UNIT

The Amended Complaint asserts that while Washington was housed in the S.H.U., he was denied access to religious services and classes. (Am. Cmplt. (Dkt. No. 20) ¶¶ 42, 45) Defendants argue that they are entitled to summary judgment on this claim because (1) Washington did not exhaust his administrative remedies concerning this claim; (2) Defendants had no personal involvement in the decision to deny Washington access to religious services and classes while housed in the S.H.U.; and (3) legitimate penological reasons exist for the rule prohibiting S.H.U. inmates from attending religious services and classes.[15]   (Def. Br. (Dkt. No. 55) at 10, 22-25).

As to exhaustion of administrative remedies, Washington did not raise this issue in his appeal of the disciplinary decision or in his March 13, 2008 Inmate Grievance Complaint. (Inmate Grievance Complaint (Dkt. No. 18) at 15-17)   When asked at his deposition whether he

---

[15] Washington has offered no legal or factual argument in opposition to Defendant's motion for summary judgment on this claim. See Pltf. Aff. (Dkt. No. 51); Pltf. R. 56.1 Resp. (Dkt. No. 52).

28

had filed a grievance regarding his lack of access to religious services and classes while in the S.H.U., Washington answered, "No, sir, I don't recall, no. I may have. I don't recall though." (Harben Decl. (Dkt. No. 56) Ex. E at 73-74) Because there is no evidence that Washington exhausted his administrative remedies as to this claim, Defendants are entitled to summary judgment concerning it.

Even if the claim had been exhausted, there is no evidence that any of the Defendants had any role in the creation of the applicable prison rule (Directive 4933) or that they played any role in the determination as to whether Washington would be allowed to attend religious services and classes while in the S.H.U. (Def. R. 56.1 Stmt. (Dkt. No. 61) ¶ 17; Pltf. R. 56.1 Resp. (Dkt. No. 52) ¶ 17; Gonyea Decl. (Dkt. No. 57) ¶¶ 16-17; Declaration of Keith Granger (Dkt. No. 58) ¶¶ 21-23; Chaboty Decl. (Dkt. No. 59) ¶¶ 16-17) Given the absence of any evidence linking the Defendants to the alleged unconstitutional action about which Washington complains, Defendants are entitled to summary judgment on this ground as well. See Sulehria v. City of New York, 670 F. Supp. 2d 288, 325 (S.D.N.Y. 2009) ("[L]iability under section 1983 require[s] proof that the defendant was directly involved·in the misconduct, either by participating in it or ordering or authorizing it.") (citing Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009)).

Finally, "'it is well-established that the enforcement of DOCS policies which restrict inmates in SHU from attending congregate religious services "is rationally related to a valid penological interest and is the least restrictive means of serving that interest."'" Perilla v. Fischer, 2013 U.S. Dist. LEXIS 154449, at *9 (W.D.N.Y. Oct. 24, 2013) (alteration in original) (quoting Leon v. Zon, 920 F.3d 379, 386 (W.D.N.Y. 2013) (quoting Smith v. Artus, 2010 U.S.

Dist. LEXIS 104660, 2010 WL 3910086 at *23 (N.D.N.Y. 2010), vacated on other grounds 522

F. App'x 82, 2013 WL 1338359, at n.1 (2d Cir. Apr. 4, 2013)).

Defendants' motion for summary judgment concerning Washington's First

Amendment free exercise claim regarding the denial of religious services and classes while he

was in the Special Housing Unit will be granted.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is

denied as to Washington's First Amendment retaliation claims but granted as to Washington's

First Amendment free exercise claim. The Clerk of the Court is directed to terminate the motion

(Dkt. No. 53). The Clerk of the Court is further directed to send a copy of this Order, via

certified mail, to pro se Plaintiff Anthony Washington, 57 Tompkins Street, Binghampton, New

York, 13903.

Dated: New York, New York
       March 30, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge

30